UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                vs.

CLIFFORD TAYLOR,

            Defendant.
_____

Case No. 19-Cr-410 (KPF)

**MEMORANDUM OF LAW IN SUPPORT OF CLIFFORD TAYLOR'S MOTION FOR TEMPORARY RELEASE ON BAIL**

FLORIAN MIEDEL, ESQ.
MIEDEL & MYSLIWIEC LLP
80 Broad Street, Suite 1900
New York, NY 10004
Tel: (212) 616-3042

*Attorney for Clifford Taylor*

## Introduction

Clifford Taylor moves the Court for a bail hearing and an order granting his release. Mr. Taylor, who is a pretrial detainee currently held at the MCC New York, is within the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world, through New York State, and within New York City. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The health risk to Clifford Taylor, because of his age and underlying medical conditions, given the conditions at the MCC, as described in detail below, necessitates his temporary release on bail until this pandemic has ended. During his temporary release, Mr. Taylor would be able to live with the mother of his children, Gwendolyn Thompson, at ▮▮▮▮▮▮▮▮▮▮.

## Factual Background

***Changed Circumstances: COVID-19 Outbreak***

As of March 16, 2020, the new strain of coronavirus which causes COVID-19, has infected over 167,000 people, leading to at least 6329 deaths worldwide.[1] On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[2] Governor Cuomo declared a State of Emergency on March 7, 2020.[3] Mayor DeBlasio declared a State of

---

[1] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[3] *At Novel Coronavirus Briefing, Governmor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (March 11, 2020) *at* https://on.ny.gov/2TKzIoz.

Emergency in New York City on March 12, 2020, and banned gatherings of over 500 people,[4] and on March 13, 2020, President Trump declared a national emergency. As of March 15, 2020, there are over 700 positive cases in New York State[5] and 329 positive cases in New York City.[6]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[7] With confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

**Conditions of Confinement and Spread of Coronavirus**

Conditions of pretrial confinement create the ideal environment for the transmission of contagious diseases.[8] Inmates cycle in and out of BOP pretrial facilities from all over the country and the world, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[9] Many people who are incarcerated also have chronic conditions, like diabetes, hypertension, hepatitis, or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health

---

[4] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, New York Times (March 12, 2020)
[5] *Novel Coronavirus (COVID-19)*, New York State Department of Health (March 12, 2020) *at* https://on.ny.gov/2vfFQvy (updating regularly).
[6] *Coronavirus*, New York City Health (March 12, 2020) *at* https://on.nyc.gov/39ME7wU (updating regularly).
[7] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.
[8] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[9] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[10] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[11] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[12] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[13] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[14] Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[15]

**Specific Conditions at the MCC/MDC**

MDC Brooklyn and MCC New York have proven—recently and repeatedly—that they are unable to protect the health and safety of defendants in their custody. The MCC and MDC are massive pretrial detention facilities: the MCC houses approximately 700 people and the MDC houses approximately 1,600 people. The majority of the people detained are housed in

---

[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.
[11] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) at https://bit.ly/2TNcNZY.
[12] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) at https://bit.ly/2vSzSRT.
[13] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) at https://cnn.it/2W4OpV7.
[14] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) at https://apnews.com/af98b0a38aaabedbcb059092db356697.
[15] *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) at https://theappeal.com

4

small two-man cells with a shared toilet and sink, and eat meals and have recreation in groups of 70 or more. Other units are open dormitories that house 70 or more inmates without the ability to separate. The medical care at both facilities has repeatedly failed to adequately address even routine medical conditions such as diabetes, pregnancy, and anemia.[16] In times of crisis, the medical care has halted entirely.

For an entire week in January and February 2019, during the sub-zero temperatures of the "polar vortex," MDC Brooklyn went without power and heat, and inmates were locked down for days at a time.[17] Inmates were denied hot food or additional blankets or warm clothing, despite the frigid air inside the facility. Inmates with serious pre-existing physical and mental illnesses received no care.[18] Even the most basic efforts, such as moving inmates requiring sleep apnea machines to breathe to the available floors with electricity, were not taken.[19]

In granting downward sentencing variances in a series of cases after the blackout, Judge Chen noted that inmates at the MDC were "subjected to very cruel conditions," and that "there was a reluctance of the part of the officials [at MDC Brooklyn] to correct the conditions or even to disclose them timely."[20] Judge Furman reached the same conclusion: "It's pretty clear to me . . . that steps could have been taken, and taken more quickly, to address the problems [at

---

[16] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, at https://bit.ly/39JRhdW.
[17] *See* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic,"* N.Y. Times (Feb. 1, 2019), *at* https://nyti.ms/2sXCIQg; Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.
[18] Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.
[19] *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, Office of the Inspector General, U.S. Department of Justice at 29 (September 2019) *at* https://oig.justice.gov/reports/2019/e1904.pdf.
[20] Tr. of Sent. Hr'g. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC) (E.D.N.Y. Jun. 4, 2019) (ECF No. 16). *See United States v. Bruney*, 18-CR-542 (PKC) (E.D.N.Y. 2019); *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019).

5

the MDC]. And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC."[21]

MCC New York demonstrated a similar inability to appropriately care for defendants in recent days. For eight days, every inmate endured a full lockdown, without access to family members or attorneys, while law enforcement searched for a loaded gun brought into the facility by a correctional officer.[22] Federal Defenders of New York clients reported to attorneys that mice and water bugs ran through the units as guards unblocked holes in walls and vents that inmates had stuffed with clothing to prevent pests. Inmates on one unit were forced to share one toilet among twenty-six people, and were prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease. On other units, toilets overflowed in two-man cells, spreading raw sewage. Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care. Female inmates were denied feminine hygiene supplies. No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

On March 13, 2020, the MCC New York issued a bulletin setting forth the protective measures it intended to take to protect inmates and staff from COVID-19. *See* Exhibit A, MCC 3/13/20 Bulletin. Even if these protective actions were to be instituted consistently and effectively, however, (and the MCC's history of dealing with crises does not inspire confidence that they would), the MCC's most vulnerable inmates, such as Clifford Taylor, will not be adequately protected.

In its bulletin, the MCC claims that all newly arriving inmates will be screened for

---

[21] Tr. of Sent. Hr'g at 31, *United States v. Ozols*, No. 16-CR-692 (JMF) (S.D.N.Y. Feb. 12, 2019) (ECF No. 31).
[22] *See* Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News, Mar. 6, 2020, *at* https://bit.ly/2xqbgjw.

6

COVID-19, with inmates who had exposure risk being quarantined and symptomatic inmates with exposure risk being isolated and tested for COVID-19. While such aspirational measures are commendable going forward, they do not account for the days and weeks of constant interaction between outsiders and inmates leading up to March 13th, and the petri dish nature of the close confinement experienced by MCC inmates. Prior to March 13, MCC staff were not wearing face masks or gloves. Hand sanitizer was not available.[23] The MCC lacked soap, hot water, or paper towels in the visitors' bathroom. Antibacterial soap was only available to inmates with money in commissary.

Indeed, despite BOP's efforts to put lipstick on a pig, the situation inside the MDC and MCC is dire. A client detained at the MDC emailed me the following description on March 14, 2020, the day after BOP's measures were allegedly put into effect:

> I want to share with you my own experience. There is no soap or toilet paper in the units. The few available cleaning supplies left inmates are fighting or stabbing each other to get them. Rumours are rampant that the disease has already spread among staff and inmates. Some inmates who are coughing and have flu-like symptoms are unwilling to tell Medical bc they fear they will be taken to SHU for 14 days and quarantined. Disinformation and Rumours are rampant that for instance african americans cannot get the virus bc of their DNA. This foments a worse situation bc people are less likely to be clean. One inmate here has an open MRSA/Staph Infection which he popped open himself in front of other inmates. He got the contagious infection from a wholesale lack of cleaning supplies in the common areas such as the showers. For instance, when the toilets in the room are clogged, which is often, inmates resort to defecating in the showers. This creates a vicious cycle of sickness, infection and disease.

In its bulletin, the MCC proudly proclaims that to date, no inmate has tested positive for COVID-19 in the BOP. That claim is laughable, since almost certainly no inmates have been *tested* for the virus. Indeed, at this juncture, neither MCC or MDC have confirmed that

---

[23] On March 12, 2020, the Warden of the MCC advised that the facility is seeking to order hand sanitizer, and that the BOP has relaxed its strictures on hand sanitizer during this period. The Warden had no information as to when hand sanitizer might arrive at the facility.

they even have testing kits available. Moreover, there is no medical ward or facility in place at the MCC, which leaves as the only alternative confinement to the SHU if an inmate becomes symptomatic.

Also on March 13th, the BOP suspended all legal visits for at least 30 days. Communication with clients has therefore become extremely difficult, if nonexistent, and the MCC has essentially no provisions for remote access. Apparently, the MCC has only one video-conference setup available for all 700 inmates, and it has not yet been tested to see if it connects with the courthouse or Probation. The bottom line is that the MCC is not equipped to deal adequately with the extraordinary and essentially unprecedented situation currently facing the world.

## The Bail Reform Act Requires Clifford Taylor's Release

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when Clifford Taylor was ordered detained have now changed. Not only are we in the midst of a pandemic that poses risks to all of us, and especially those confined together in small spaces, but it poses a particular and acute risk to the elderly and those with underlying medical conditions. Clifford Taylor fits precisely into that category.

First, Mr. Taylor is 69 years old. The CDC and World Health Organization have made clear that people over 60 years old are particularly at risk in this crisis.[24] The vast majority of those who have died so far from the virus were over 60 years old and/or suffered from

---

[24] https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html

underlying medical conditions.

Second, Mr. Taylor suffers from underlying medical conditions – specifically ███████████████████████████████████████████ *See* Selected MCC Medical Records for Clifford Taylor, attached as Exhibit B.  When Mr. Taylor first entered the MCC in May 2019, lab tests revealed ██████████████████ (*see id.* at Bates No. 003), a diagnosis he was aware of from earlier medical evaluations.  *See id.* at Bates No. 002.  The disease appears to be under control and Mr. Taylor's current viral load is normal, but with such a serious underlying condition, his health is always precarious.  Mr. Taylor has also been taking medication for ████████████████████████████████████████████████████████████████████████████████████████.  *See id.* at Bates Nos. 009.

Taken together, Mr. Taylor's age and health conditions make him particularly susceptible to negative, if not fatal, outcomes if he contracts the coronavirus.  The current states of emergency direct people to remain at home, socially distant from others.  The elderly, in particular, are directed to not leave their houses to avoid the possibility of contracting the virus.  Mr. Taylor, who is in the category of those most at risk, is crammed into one building with 700 other inmates, at the mercy of an institution whose solution to the problem is to lock everyone in their cells and throw away the key.  As the Court may recall, Mr. Taylor did not fare well during the 8 day lockdown at the MCC when the facility was searching for a smuggled gun.  He did not have access to his blood pressure medication for several days.  His sleep was constantly interrupted for middle of the night searches.  His cellmate was suffering from some kind of respiratory illness for which he was not getting treatment, causing Mr. Taylor significant concern that he was being exposed.  He did not have access to a hot shower for a week, was given primarily snacks for food, with only occasional hot meals.  This took place when the MCC was not yet experiencing major staffing shortages due to coronavirus

9

quarantine or isolation. One can only imagine the conditions facing Mr. Taylor going forward. As a result, Mr. Taylor requires the Court's intervention.

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial).

The courts have long recognized in this context that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). *See also United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Clifford Taylor will yield, relative to the heightened health

risks posed to Mr. Taylor during this rapidly encroaching pandemic. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

### Under the Present Extraordinary Circumstances, Mr. Taylor's Release on Bail is Appropriate

Clifford Taylor is charged with drug offenses and 18 U.S.C. §924(c) counts that mandate a minimum sentence of 15 years if he is convicted. As the Court is aware, the government has offered Mr. Taylor a plea to a violation of 21 U.S.C. § 841(b)(1)(B), which carries a mandatory minimum sentence of 5 years. The charges against Mr. Taylor are no doubt serious, and carry a presumption of pretrial detention. Nonetheless, the unique circumstances confronting us at the present suggest a reconsideration of Mr. Taylor's bail conditions. First, while drug and gun charges are inherently serious, the circumstances of that possession bear repeating. Mr. Taylor is accused of possessing these items in a trap behind a wall of a closet in his apartment, which was discovered as a result of a tip received by his parole officer. Mr. Taylor is not accused of selling these drugs or using these weapons. He is not accused of assaulting or robbing or shooting. Thus, on the spectrum of "presumption" cases, Mr. Taylor's falls more on the benign end.

Second, for the reasons expressed above, Clifford Taylor, like all inmates at MCC – due

to their close proximity with each other and staff, their inability to isolate, the unknown degree to which COVID-19 is already spreading through the facility – is particularly susceptible to contracting the virus.  However, unlike most others in his position, Mr. Taylor is especially at risk of falling gravely ill, or even dying, if he contracts the disease.  As noted above, the elderly and those with underlying medical conditions are the ones most at risk of severe consequences. Pretrial detention is designed to ensure that people return to court and to protect the community. It is not intended to be a death sentence, or to cause those detained to endure misery and suffering.

Moreover, the risks to the community that individuals like Mr. Taylor purportedly pose are greatly exaggerated. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[25] In the Eastern District of New York, Chief U.S. Pretrial Services Officer Roberto Cordeiro reports that in Fiscal Year 2019, only six of 1,300 defendants (0.5%) under Pretrial Services' supervision failed to appear in court; only 2.8% were rearrested.  The elderly and chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives.  We must recognize that during this extraordinary time, the usual considerations concerning bail do not apply.  Protecting the public from a 69 year old man with health problems, who, if released, will be confined to his home does not, in this instance, outweigh the tragic possibility of serious illness or even death that he encounters by remaining confined at the MCC.

---

[25] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

**Conclusion**

Accordingly, I respectfully ask the Court to convene a bail hearing and to release Mr. Taylor on bail, subject to any conditions, including home confinement, the Court wishes to impose. I also respectfully urge the Court to act quickly, because every day that Mr. Taylor remains in custody at the MCC increases his chances of becoming ill.

Dated: New York, New York
       March 16, 2020

                                        Respectfully Submitted

By:
                                        */s/ Florian Miedel*
                                        Florian Miedel, Esq.
                                        MIEDEL & MYSLIWIEC LLP
                                        80 Broad Street, Suite 1900
                                        New York, NY 10004

                                        *Counsel for Clifford Taylor*