**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 18, 2020

**BY ECF and EMAIL**
The Honorable Katherine Polk Failla
Thurgood Marshall
United States Courthouse
40 Foley Street
New York, New York 10007

   Re:   *United States* v. *Clifford Taylor*, 19 Cr. 410 (KPF)

Dear Judge Failla:

   The Government respectfully submits this letter opposing the request by Clifford Taylor, the defendant, that he be temporarily released on bail from the Metropolitan Correctional Center ("MCC"). For the reasons that follow, temporary release of the defendant is unwarranted.

   **I.    Background**

   On February 22, 2019, the defendant was arrested by the New York City Police Department following a parole search of his residence that revealed substantial quantities of fentanyl, cocaine, marijuana, narcotics paraphernalia (including mixing agents, a hydraulic press, a grinder, and a respirator mask), two firearms, several rounds of ammunition, and over $10,000 of United States currency. The defendant's February 22 arrest is merely the most recent of a string of several encounters with the criminal justice system, spanning nearly 50 years, relating to narcotics and violent offenses.

   In 1971, at age 20, the defendant was arrested on robbery and firearm charges in the Bronx; he ultimately pleaded guilty a year later to attempting to commit a Class D felony, in violation of New York Penal Law § 110.00, and was sentenced to a term of probation of five years.

   Three years later, in 1974, while subject to probation, the defendant was again arrested on robbery and firearms charges, and ultimately convicted, upon a guilty plea, of robbery in the second degree, in violation of New York Penal Law § 160.10. He was sentenced to an indeterminate term of incarceration of 5 to 10 years, and he was released to parole on November 12, 1986.

   Less than three years into his term of parole supervision, on April 17, 1989, the defendant was arrested for attempted murder and criminal possession of a weapon. On July 2, 1990, he was

convicted, upon a guilty plea, of attempted murder in the first degree, in violation of New York Penal Law § 125.25, and sentenced to an indeterminate term of incarceration of 6 to 12 years. He was released to parole on February 26, 1998.

On December 7, 2005, the defendant was (again) arrested while on parole. He was arrested for a variety of narcotics offenses and criminal possession of a weapon. On March 20, 2006, the defendant was convicted, upon a guilty plea, of attempted criminal possession of a loaded firearm in the third degree, in violation of New York Penal Law § 265.02, and criminal possession of a controlled substance in the fifth degree, in violation of New York Penal Law § 220.06. The defendant was sentenced to a term of incarceration of 3 years and was released to parole on June 27, 2008.

On November 24, 2010, the defendant was (again) arrested while on parole for narcotics and firearms offenses. A parole search of the defendant's residence in the Bronx resulted in law enforcement finding in the defendant's bedroom closet "(1) loaded firearms, (2) live ammunition, (3) several hundred glassine bags suitable for packaging contraband, (4) a scale to weigh contraband, (5) a money counting machine[,] and (6) a compressor used to seal contraband." *Taylor v. Vierno*, 34 Misc. 3d 1202(A), 2011 WL 6755927, at *1 (Bronx Cnty. Sup. Ct. Dec. 23, 2012). Many (but not all) of the fruits of that search were later suppressed upon a finding they were contained in a safe found inside the defendant's bedroom closet that was subsequently removed from the apartment, taken to a local police precinct, and searched without a warrant at the police precinct. *Taylor v. Vierno*, 34 Misc. 3d 1234(A), 2012 WL 687910, at *1-2 (Bronx Cnty. Sup. Ct. Mar. 2, 2012). Following resolution of the defendant's suppression motion, he was subsequently remanded to custody on March 19, 2012, for violating the terms of his parole, and released to parole approximately six weeks later on May 25, 2012.

On October 7, 2014, the defendant was arrested after heroin was recovered from his vehicle. He was convicted, upon a guilty plea, in connection with that arrest on July 11, 2016, of attempted criminal possession of a controlled substance, heroin, in violation of New York Penal Law § 220.16(12). He was sentenced to a term of imprisonment of four years and released to parole on March 1, 2018.

Within a year of having most recently been released to parole, on February 22, 2019, the defendant was arrested in connection with the instant offenses. That arrest marked the defendant's fifth arrest by New York State authorities while he was subject to parole or probation.

## II.    Discussion

The defendant's request for temporary pretrial release should be denied. Pursuant to Title 18, United States Code, Section 3142(i), after a defendant has been ordered detained pretrial, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of the United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Because the defendant's request contains no discussion of any need for temporary release to prepare for his defense, the Government construes the defendant's request

as one premised on a "compelling reason"—specifically, the health risk to the defendant posed by the COVID-19 outbreak.

As an initial matter, the defendant's request should be rejected because he cannot show by clear and convincing evidence that he would not pose a danger to the safety of the community or risk of flight if temporarily released. *See* 18 U.S.C. § 3142(e)(3)(A), (B). *Cf.* 18 U.S.C. § 3143(a)(2) (requiring post-conviction detention for a defendant who has pled guilty to a controlled substance offense unless (1) the defendant demonstrates by clear and convincing evidence that he will not flee or pose a danger to the community *and* (2) "it is clearly shown that there are *exceptional* reasons why such person's detention would not be appropriate" (emphasis added)).[1]

The defendant has demonstrated through his repeated conduct a long history of committing narcotics and firearms offenses that pose a substantial danger to the community. The defendant's conduct spans nearly 50 years and, as evidenced by his most recent arrest, it has not slowed down in the least.[2] The defendant, moreover, has proven on at least two occasions in the last eight years that he needs little more than a closet (which the Government assumes would be available at the residence of his children's mother) to engage in the dangerous criminal conduct for which he was most recently arrested—specifically, to store firearms and amass harmful controlled substances for distribution.

With respect to the defendant's risk of flight, as the defendant himself notes, the Government has offered the defendant a plea to an offense carrying a mandatory minimum sentence of 5 years—but he does not mention that the plea offer would also carry a stipulated Guidelines range of 188 to 235 months' imprisonment. (The defendant qualifies as a career offender under the U.S. Sentencing Guidelines.) It has been communicated to defense counsel that the Government's current plea offer is the last and best offer the Government will be making in this case. In addition, for nearly 50 years, the defendant has shown an unwillingness to abide by the terms of judicially imposed supervision. Together, the certainty of a resolution resulting in at least five years' imprisonment in this case and the defendant's demonstrated unwillingness to adhere to judicial supervision create a risk of flight the defendant cannot rebut with clear and convincing evidence.

---

[1] At least one district judge has assumed "similar standards apply under the 'compelling reason' language of § 3142(i)" governing pretrial temporary release and the "'exceptional reasons' language of § 3142(i)" governing presentence release following a conviction for the crimes with which the defendant in this case has been charged. *United States v. Spinks*, No. 1:18-CR-00084-JAW-1, 2019 WL 2238359, at *2 (D. Me. May 23, 2019). *See also United States v. Ramnath*, 533 F. Supp. 2d 662, 667 (E.D. Tex. 2008).

[2] The defendant argues a "compelling reason" for pretrial release overrides any safety concerns because he was "not accused of selling the[] drugs or using the[] weapons." (Def. Br. at 11.) The defendant is charged with possessing the drugs *with the intent to distribute them* (indeed, the drugs were accompanied by a scale; a hydraulic press; and grinders) and with possessing two firearms with several rounds of ammunition behind the same trap door as the drugs. Although the defendant was not arrested while in the act of selling the drugs or using the firearms, he is charged with intending to sell the drugs and using the firearms in connection with such intended sales.

But even if the defendant's release did not pose a danger to the community or risk of flight, denial of his request would still be warranted because he has not offered a "compelling reason" for temporary release. At most, the defendant offers speculation both that the defendant is more likely to suffer adverse health consequences if he remains in the MCC *and* the Bureau of Prisons would be unable to attend to such adverse health consequences if they arose. Although the Government does not dispute that the defendant's age and health conditions put him at greater risk for adverse health consequences were he to contract COVID-19, it is unclear that such a risk is enhanced by remaining at the MCC as opposed to the residence of the mother of his children (that is, the residence at which the defendant proposes he reside pretrial if he were to be released).[3]

While it is true that the MCC itself is a densely occupied detention facility, the MCC is also by its very nature isolated from the outside world. Such relative isolation has, if anything, been increased by the COVID-19 outbreak because in response to the outbreak the MCC has taken steps to limit contact by visitors to the inmates. By contrast, the defendant has proffered no facts relating to the relative isolation of the apartment unit of the mother of his children; any measures taken by the apartment building where that apartment unit is located to limit the spread of COVID-19; and whether residents of that apartment have tested positive for COVID-19 or manifested any symptoms related to COVID-19. Put differently, occupants of the MCC are effectively subject to a "shelter in place" order; residents of apartment buildings in New York City are not. The defendant similarly has not proffered how his access to medical care would be improved by residing outside the MCC with the mother his children in the event he contracted COVID-19.

The defendant cites several cases in support of his motion, all of which involve defendants with *existing* health conditions being released to primary caregivers. In *United States v. Scarpa*, 815 F. Supp. 88, 90-93 (E.D.N.Y. 1993), the district court found a "compelling reason" for the temporary release of a defendant to a hospital (not a residence) where the defendant was terminally ill with AIDS and had sustained a gunshot wound to the face; the defendant had fallen and bled as a result while at the MCC, "endangering fellow inmates who volunteer to assist him in moving about"; his family had agreed to reimburse the government for security by the Marshal's service, which would "have complete control over visits and calls"; and it was found the staff at the MCC were unable to meet the defendant's medical needs. In *United States v. Adams*, 6:19-MJ-87-MK, 2019 WL 3037042 (D. Or. July 10, 2019), the defendant was released to home detention upon showing *existing* (not speculative) adverse health conditions for which the defendant's sister was his primary caregiver and for which he was not receiving medical care in custody.[4] So, too, did

---

[3] The defendant's request may also be denied because he has not set forth any articulable explanation that his proposed release from pretrial custody would be "temporary," which is the only form of pretrial release authorized by 18 U.S.C. § 3142(i). The defendant requests only that he be released during the pendency of the COVID-19 outbreak but does not explain how or when the parties will know such an outbreak has sufficiently been mitigated to allow for Mr. Taylor's return to the MCC.

[4] Relevant to the Court's holding in *Adams* was that the danger to the community posed by the defendant—who had been charged with attempted child enticement and attempted receipt of child pornography—could be mitigated through house arrest and a commitment by the defendant's sister that she would discontinue internet service at the residence where the defendant would be confined pretrial. *Adams*, 2019 WL 3037042, at *1. No similar conditions can be imposed here, where the

*United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017), involve release for an *existing* health condition for the purpose of well-defined medical treatment (cancer treatment at a hospital), as did *United States v. Cordero Carabalo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (treatment for "serious" and "grotesque" gunshot wounds following gun battle between defendant and DEA agents and release to two relatives who were professional nurses; Bureau of Prisons found unable to provide necessary medical care; and defendant found *not* to pose danger to community because he was not "mobile enough to roam in the community").

### III.    Conclusion

For the foregoing reasons, the defendant's request for temporary pretrial release should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: /s/ _____
Daniel H. Wolf
Assistant United States Attorney
(212) 637-2337

cc:    Florian Miedel (by ECF and email)

---

danger the defendant poses to the community relates to his intent to distribute and possession of controlled substances and firearms—offenses that are not principally committed through the internet.